UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS

Chapter 7
Case No. 15-12351 (FJB)

In re:

ABBINGTON PARTNERS, LLC
Debtor

JAMES MITCHELLS' VERIFIED OPPOSITION TO
TRUSTEE'S MOTION TO COMPEL JAMES MITCHELL
TO TRAVEL 700 MILES TO AN UTTERLY FRIVILOUS HEARING

The Trustee has requested that James Mitchell ("James") be compelled to travel over 700 miles to attend a 341 hearing that should not be held in the first place. This Court has no authority to compel a witness to travel more than 100 miles, and even if it did, the Trustee's request should be denied because by the Trustee's own admission, he is only seeking information pertaining to the adversary action he recently filed.

All of the factual allegations contained herein are verified by James (see verification on page 15). In addition, James is submitting *Fourth Affidavit of Karen Mitchell* ("Karen Fourth Aff.") from his sister, Karen Mitchell ("Karen").

- 1 -

## I. FACTUAL BACKGROUND

Essentially all of the facts are not disputed by the Trustee or any of Abbington's creditors.

James (who is not a lawyer) is an entrepreneur who is interested in the intersection of business and law. In April 2011, he attended a legal conference at which he learned about a new case type, namely issuers of auction rate securities ("ARS") bringing FINRA arbitration claims against the broker/dealers who underwrote the issuance of ARS bonds. James set up an office at 76 Summer Street in Boston and hired as independent contractors approximately eight people, two of whom – Ralph Griesenbeck ("Griesenbeck") and John DerBoghosian ("DerBoghosian") – were software developers and/or system administrators.

Abbington raised money from Frank Iacono ("Iacono"), who liked James' idea so much that he repeatedly tried to buy James out. After several refusals by James, Iacono decided to simply steal James' business, and such theft was effectuated in August 2012, when Iacono persuaded several key Abbington workers to quit working for Abbington and work for Iacono (the "Departure").

As the Trustee correctly notes in the Complaint, Karen loaned the Debtor monies. Such loans were made in 2011 and 2013. With interest, the amount owed to Karen was in excess of $51,000. As the Trustee also correctly notes in the Complaint, in 2013 the Suffolk Superior Court ordered that $300,000 be released to Abbington, but that $249,000 of that

was never received by Abbington, as it was used for JAMS fees, payments to Abbington's counsel, and an attachment by DerBoghosian. Thus, Abbington ended up with $51,000.

After this, the Trustee gets his facts wrong, alleging that the $51,000 was paid to Karen. In fact, neither Karen nor any affiliate of Karen received, directly or indirectly, one cent of this $51,000 (Karen Fourth Aff. ¶ 9). Furthermore, even if Karen had received such monies, which she did not, she was owed by Abbington in excess of $51,000.

After the Departure, Abbington started to run out of cash, and was unable to pay rent for its Summer Street office (owned by Kalnex Limited Partnership). Kalnex and another landlord initiated eviction proceedings. In January 2013, Abbington filed a voluntary bankruptcy petition in Boston, case 13-10224 (Feeney, J) (the "First Bankruptcy Case"), which stopped the two eviction proceedings. Both landlords sought relief from the automatic stay. Iacono was aware of the details of the First Bankruptcy Case in that he had his attorneys, Burns & Levinson, spend thousands of dollars to monitor the case. Thus, starting in February 2013, Iacono was aware that Abbington no longer had offices at 76 Summer Street.

In early 2014, Abbington relocated to North Carolina, establishing offices at Six Consultant Place, Durham, North Carolina. Since that date, Abbington has had no business activities in Massachusetts. At the same time, James moved to North Carolina, as did Abbington's software developer, Ralph Griesenbeck ("Griesenbeck"). In June 2014, Abbington filed a voluntary petition in the Central District of North Carolina, case no.

BK-14-80681 (the "Second Bankruptcy Case"). Iacono filed certain motions in the Second Bankruptcy Case. In opposition, in July 2014, James filed one affidavit from himself (Exhibit 8), two affidavits from Griesenbeck (Exhibits 9 and 10), and two affidavits from Karen (Exhibits 11 and 12) conclusively demonstrating that Abbington had permanently relocated to North Carolina in early 2014 and after such move, Abbington had no connection with, or assets in, Massachusetts. In such affidavits, James conclusively demonstrated that Abbington had set up offices in Durham, North Carolina, and James even attached photographs of Abbington's office space in Durham, comprising about six offices, including James' office and Griesenbeck's office (see Exhibit 8, Appendix A). Thus, as of July 2014, Iacono was aware that Abbington had relocated to North Carolina and no longer had offices at 76 Summer Street.

In June 2015, Iacono and two other purported creditors commenced an involuntary petition against Abbington (Exhibit 13) (the "Third Bankruptcy Case"). In April 2016, the Trustee commenced an adversary action (the "Second Adversary Action") against James and Karen.[1]

In June, 2015, Iacono and two other purported creditors filed this involuntary case in Boston. On July 17, 2015, Iacono emailed Mitchell copies of this Court's order appointing attorney Desmond as the Chapter 7 Trustee. Within an hour or two, Mitchell

---

1. The first adversary action was the action the Trustee filed seeking to have attorneys at Cohan Rasnick reveal priviliged attorney-client communications, even though Cohan Rasnick represented James individually.

telephoned Desmond to introduce himself and to answer any questions Desmond might have. Desmond then conferenced in Alan Braunstein ("Braunstein") of Riemer & Braunstein ("R&B"). In subsequent calls with Mitchell, Braunstein conferenced in attorney Mark Corner ("Corner").

On the first phone call with the Trustee and Bronstein, they asked James to provide them with numerous documents. James proposed using Dropbox; they agreed. James spent about ten hours assembling the documents and putting them into various folders and subfolders, in order to save them time. After about a week, R&B informed Mitchell that they considered Dropbox to be insecure.[2] They proposed their own file sharing service (the "FSS"). Mitchell spent several hours (including phone calls with R&B's technology personnel and technical support with the FSS), including repeated reinstallation by Mitchell of various Java libraries. After all of that effort by Mitchell, the FSS simply does not work. Mitchell then left various phone calls with R&B, which were not returned. Neither the Trustee nor R&B has made any effort to find a way so that Mitchell can transfer the documents he so painstakingly assembled.

---

2. From a technical point of view, such an objection is ridiculous, as Dropbox is a major company currently valued at approximately $10 billion, and is used by most Fortune 500 companies. Even if it was true, R&B could easily install Dropbox on a PC not attached to their local area network and then have all of the files downloaded to the PC. They could then use a USB memory stick to transfer the files to their local area network.

Overall, Mitchell has left more than 20 telephone messages for Mark Corner which Corner refuses to return. The same is true for Alan Braunstein, except that the number of unreturned telephone calls is much less.

II. ARGUMENT

## 1 James Has Fully Cooperated with the Trustee

The Trustee begins his motion with a material misrepresentation – i.e., namely that James has not cooperated with the Trustee. As noted above, within *hours* of being informed of the existence of this case, Mitchell telephoned the Trustee to introduce himself and to see what information the Trustee needed. Neither the Trustee nor his counsel ever made any written request for documents from James, so James spent about ten hours assembling tens of thousands of pages for the Trustee, all neatly organized into folders and subfolders, and then uploaded these files onto Dropbox. The Trustee's counsel then took about a week to say they would not use Dropbox and then requested that James use another FTP service. James spent about 15 hours over several weeks attempting to get the second FTP service to work; it never did.

And then the Trustee and his counsel simply went away. James has left in excess of twenty phone calls for Mark Corner which Corner has refused to return. The other attorney, Alan Braunstein, has also refused to return James' telephone calls, although the numbers are much less than for Braunstein. James has filed a request for notices, but the

Trustee and his counsel often do not serve James with documents, and James learns about the documents either from Pacer or from his former counsel, Jonathan Plaut.

It is clear that James has gone to heroic efforts to cooperate with the Trustee, and it is the Trustee who has refused to work with James.

## 2 Boston is an Improper Forum

It should be noted that Boston is clearly an improper forum for this case. In early 2014, Abbington and Mitchell relocated to North Carolina (Karen Fourth Aff. ¶ 4), along with Abbington's software developer/system administrator, Griensenbeck (Karen Fourth Aff. ¶ 5). Since that time, Abbington has conducted *all* of its business in North Carolina. The Second Bankruptcy Case, filed about a year before this one, was in North Carolina. Of the three petitioning creditors, Iacono is clearly the ringleader, and Iacono knew in June 2015 (when the involuntary petition was filed) that more than one year before that, Abbington had left Massachusetts for good.

The only reason the clerk even accepted Iacono's petition is that Iacono perjured himself, saying that Abbington's address was 76 Summer Street, Boston, when in fact 16 months before that Abbington was evicted from that address.

## 3 Frivolous Action

As will be noted herein, essentially the sole purpose of the second 341 hearing is to ask questions concerning the Trustee's allegations in the Second Adversary Action. The

key allegation -- namely that James transferred $51,000 to Karen -- is patently untrue. Not one dime of the $51,000 was paid (directly or indirectly) by James, Abbington or anyone else to Karen or any of her affiliates (Karen Fourth Aff. ¶ 9). Thus, the Second Adversary Action is clearly abusive and frivolous.

## 4 A 341 Hearing is Different from a Deposition

The Trustee is clear in why he wants a second day of testimony, namely "the Trustee's demand for information regarding payments to Mitchell's sister." As the Trustee admits in his motion, that is essentially the only reason why the Trustee is conducting a second 341 hearing.

The purpose of a 341 examination is to ask questions about the Debtor's financial affairs. Assuming this Court permits the Trustee to question James about payments to Karen (which never occurred), such testimony should be conducted in the context of a deposition within the Second Adversary Action, pursuant to Bankruptcy Rule 7030, not a 341 hearing.

As for a deposition in the Second Adversary Action, a deposition less than two weeks after the two defendants (Karen and James) have been served is clearly premature. Since Karen received not one cent of the $51,000 in question, Karen and James should be given the opportunity to seek to obtain summary judgment before the Trustee is permitted to engage in his absurd complaint. The Trustee is attempting to conduct a deposition before the answer is due!

## 5 This Court Has No Authority to Order James to Travel 700 Miles to Boston

The Trustee cites no authority for how this Court can order James to travel 700 miles to Boston. Fed.R.Civ.P. 45 (c) states that a federal court can compel a witness to travel up to 100 miles or alternatively within the state that the witness resides. The Trustee is off by 600 miles.

And that makes clear what the Trustee is attempting to do. He seeks information pertaining to the purported payment to Karen (which never even occurred). Since James resides in North Carolina, he knows he cannot compel James to appear for a deposition in the Second Adversary Action 700 miles away. So the Trustee recharacterizes a deposition as a 341 examination and asks this Court to endorse his attempt to sidestep the rules.

## 6 James Cannot Afford to Travel to Boston

James cannot afford to travel to Boston. James is currently living on funds borrowed from Karen (Karen Fourth Aff. ¶ 7) and she is not willing to loan additional monies for a trip to Boston (Karen Fourth Aff. ¶ 8).

The Trustee states, "Upon information and belief, Mitchell has travelled to California at presumed cost of more than the amount to travel to Boston." This statement is incorrect. The last time James has traveled to California was in 2005, to attend his

father's funeral (Karen Fourth Aff. ¶ 6).[3] Since then, he has never been to California and he certainly has not been to California after early 2014, when he moved to North Carolina (Karen Fourth Aff. ¶ 6).[4]

## 7 The October 21, 2015 Telephonic Hearing Worked Well

The Trustee correctly notes that a full 341 examination was conducted telephonically on October 21, 2015. Interestingly, the Trustee does not contend that he (or the one creditor who attended, Iacono) was in any way handicapped by conducting the hearing telephonically, as opposed to in person. In fact, the hearing went well and it lasted several hours. James answered questions until the Trustee, his counsel and Iacono had no more questions; in other words, James stayed until the very end.

The conduct of the Trustee and his counsel at the October 341 examination should be noted. Several times they asked questions James did not know the answers to and James volunteered that he could look up the answer by accessing documents on James' computer. In other words, in 60 seconds or so, James could answer the question with a definite, clear, accurate answer. In *each* case, the Trustee and his counsel said, "Never

---

3. There is one exception to this statement. Back when Abbington had sufficient funds, Mitchell traveled to San Francisco for a business conference.

4. Unlike other misstatements by the Trustee, this misstatement was not intentional. At the October 2015 341 examination, Mitchell stated he might be in California over the holidays. At that time, Mitchell was hopeful that Karen would pay for such a trip; however, Karen refused to do so.

mind" -- they did not want James to look up the answer! Given this happened numerous times, an objective observer would conclude that the Trustee was more interested in "scoring points" than in collecting information.

## 8 Telephonic 341 Hearings Are Specifically Authorized

As noted herein, the Trustee is attempting to use a 341 hearing to conduct a deposition in an adversary action. Even if a second 341 hearing was warranted (which it is not), the *Handbook for Chapter 7 Trustees* (p. 3-9) clearly authorizes telephonic hearings (Exhibit 19):

> When the debtor cannot personally appear before the trustee, arrangements must be made for an independent third party authorized to administer oaths to be present at the alternate location to administer the oath and to verify the debtor's identity and social security number.

## 9 Documents

The Trustee states, "The Trustee needs to have Mitchell's testimony regarding documents the Trustee intends to present to Mitchell in person at the 341 hearing." The Trustee can easily email James such documents ahead of time or contemporaneously during any telephonic hearing.

## 10 Creditors

The Trustee further states that certain unnamed creditors wish to cross exam James. The only creditor who has been interested enough in this case to attend any hearing has been Iacono, who appeared in Boston on October 21, 2015 to cross exam

James telephonically. Approximately 40 percent of such 341 examination was conducted by Iacono, and there is no evidence that Iacono was handicapped in any way. Furthermore, Iacono has no right to attend a deposition in the Second Adversary Action, since he is not a party to that case.

## 11 Karen's Address

The Trustee also asks that James be compelled to provide Karen's address. Such request is particularly strange because the Trustee has already served Karen with his complaint in the Second Adversary Action at Karen's address and thus the Trustee clearly already knows Karen's address. Nevertheless, James confirms that Karen's address is Six Consultant Place, Suite 100-A, Durham, North Carolina 27707, where Karen has been served with the summons and complaint in the Second Adversary Action.

## 12 Two Other Matters

As an afterthought, at the very end of his motion, the Trustee mentions two other matters. First, he mentions possible claims against the Debtor's former counsel. As this Court is aware, such counsel also represented James individually. James has chosen not to waive the attorney-client privilege and thus he is not able to provide the Trustee with any information on this subject, as he cannot provide any information without revealing privileged communications. The Trustee has copies of the two engagement agreements among such counsel, James and Abbington and if the Trustee wishes to assert claims against such counsel, he is free to do so.

The Trustee also mentions "recoveries from at least two FINRA litigation matters." James has essentially no knowledge concerning the recoveries and he has already provided to the Trustee the little information James knows has already been provided to the Trustee. James has repeatedly told the Trustee that the two people who do have such information are attorneys Joseph Peiffer and Jeffrey Kaplan, who represented the 18 ARS issuer clients that James obtained. In addition, Iacono may have knowledge concerning such recoveries. James does not know what attempts the Trustee has made to contact those three individuals, but assuming the Trustee has not, the Trustee should do so.

Both of these issues were exhaustively covered at the first 341 examination. Since October 2015, James has not changed his position on waiving the attorney-client privilige, so any further questions on possible claims against Abbington's former counsel would be a waste of time. In addition, since October 2015, James has not learned anything new concerning the FINRA recoveries so additional questions concerning such recoveries would be unfruitful. (In addition, the Trustee can obtain complete information from attorneys Peiffer and Kaplan.)

III. CONCLUSION

This case should not have ever been filed in Boston. Not one dime of the $51,000 was ever given to Karen or any of her affiliates (directly or indirectly) and thus the Second Adversary Action is abusive and frivolous. Since the Trustee seeks only to ask James questions about his allegations in the Second Adversary Action, a second 341 examination

is not an appropriate forum. No deposition in the Second Adversary Action should occur until James and Karen have an opportunity to answer and to file a motion for summary judgment.

Assuming this Court believes a second 341 hearing should be conducted, James should not be compelled to appear in Boston. Any such order by this Court would in violation of Fed.R.Civ.P. 45, and James simply does not have the funds to comply. Finally, James reminds this Court that every factual allegation in this pleading is verified by James.

## IV. RELIEF REQUESTED

For the reasons set forth above, James requests that this Court:

1. Issue an order cancelling the May 5, 2016 341 examination, or alternatively issue an order that James need not appear at such examination, in person or telephonically;

2. Alternatively, issue an order that James does not need to appear in person for such 341 examination; and

3. If James is compelled to appear by telephone on May 5, 2016, issue an order that James need not answer any questions that pertain to the allegations in the Complaint filed in the Second Adversary Action.

Date: April 21, 2016.

Respectfully submitted,

*[signature: James Mitchell]*
James Mitchell, *pro se*
6 Consultant Place, Suite 100A
Durham, NC 27707
(424) 249-7910
Fax (424) 249-7990
jmitchell102@gmail.com

## VERIFICATION

I declare under the pains and penalties of perjury under the laws of the State of North Carolina that I have read the foregoing pleading. Based on my own personal knowledge, all of the factual allegations contained herein are true and accurate.

Dated: April 21, 2016.

*[signature: James Mitchell]*
James Mitchell

M:\522600   Abbington Partners, LLC\1800   Iacono Involuntary   June 2015\Pleadings\2016-04-06   01   Apr 06, 2016   Motion to Compel JM to Appear\2000   James' Opposition\1000   Current Version\James' Opposition   2016-003   Apr 19, 2016.docx