UNITED STATES BANKRUPTCY COURT FOR THE
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>ABBINGTON PARTNERS, LLC,<br><br>               Debtor. | Chapter 7<br>Case No. 15-12351 (FJB) |

## **AFFIDAVIT OF PETER H. SUTTON**

Peter H. Sutton states under the penalties of perjury that the following facts are
true:

1.     I am a Senior Partner at the Law Firm of Riemer & Braunstein LLP.  I am
Chairman of the Firm's Litigation Department.

2.     I am familiar with Riemer & Braunstein's representation of John O.
Desmond, Chapter 7 Trustee of Abbington Partners, LLC in the above-referenced
bankruptcy.  I am also familiar with the adversary proceedings in the case, including the
fraudulent transfer claim asserted against James Mitchell and Karen Mitchell in
Adversary Proceeding No. 16-1060).

3.     On May 25, 2016, I was forwarded a message from James Mitchell, who
had attempted to contact Stanley J. Riemer, the Managing Partner of the Firm, regarding
a "dispute."

4.     Mr. Mitchell told me that he had a dispute with Riemer & Braunstein.  I
asked him if he were a firm client, and he acknowledged that he was not.  Mr. Mitchell
would not explain the reason for his call but said he would send me a draft complaint and
he would call me at 10:00 a.m. on May 26, 2016 to discuss "settlement."

5.     Following my telephone call with Mr. Mitchell on May 25, 2016, he sent me an e-mail, with an attached "rough draft of a complaint" in the form attached as Exhibit A.

6.     Mr. Mitchell telephoned me at 10:08 a.m. on May 26, 2016. Alan Braunstein was present in my office when I spoke with Mr. Mitchell.

7.     During our telephone call, Mr. Mitchell indicated that he wanted to discuss a "settlement." I told him that there was "nothing to settle," since he did not have any pending claims. Mr. Mitchell then asked me if I read his complaint and indicated that if the law firm did not settle with him he would "get money" from us.

8.     I asked Mr. Mitchell if he was trying to extort money from Riemer & Braunstein, and he responded that he did not want us to continue pursuing him in the bankruptcy case, and if we did not "go away," he would file suit in North Carolina, on the claims raised in the draft complaint.

9.     I told Mr. Mitchell that because he was not represented by counsel he should engage counsel before he brings suit. I also asked him if he was familiar with the so-called "Barton Doctrine," and he indicated that he was not.

10.     Mr. Mitchell ended the conversation indicating the he did not think we were going to reach a resolution and that he would "see us in court in North Carolina."

**Signed under the penalties of perjury this 27th day of May, 2016.**

Peter H. Sutton

**EXHIBIT A**

| | |
|---|---|
| **From:** | jmitchell@abbingtonpartners.com |
| **Sent:** | Wednesday, May 25, 2016 3:46 PM |
| **To:** | Peter H Sutton |
| **Subject:** | Rough draft of a complaint |
| **Attachments:** | Complaint   2016-003   May 24, 2016.pdf |

Thank you for your call. I will call you tomorrow at 10 am Eastern.

Attached is a very very rough draft of a complaint. If we don't settle, I would spend another week or so adding to it and then asking a lawyer to rewrite it.

James Mitchell
(424) 249-7910

DURHAM COUNTY:

SUPERIOR COURT
Civil Action No. _____

KAREN MITCHELL, )
JAMES MITCHELL )
  Plaintiffs )
  )
v. )
  )
RIEMER & BRAUNSTEIN LLP, )
MARK W. CORNER, )
ALAN L. BRAUNSTEIN, )
JOHN O. DESMOND, )
FRANK ANTHONY IACONO, )
IACONO LAW, LLC, )
SOUTH HAVEN FINANCIAL, LLC, )
BIMAL RAJ MERCHANT )
  Defendants )
————————————————————— )

## VERIFIED COMPLAINT

### (Jury Trial Demanded)

  Plaintiffs Karen Mitchell ("Karen") and James Mitchell ("James") complain and allege as follows. All of the factual allegations contained here are verified by each of them (see verification on page 22).

## INTRODUCTION

  1. This case concerns the attempts of six unethical and dispicable attorneys who are attempting to extort the Plaintiffs by, among other things, filing and prosecuting an utterly frivolous adversary action in the Boston bankruptcy court. In such action, each of them has conspired to assert that James transferred $51,000 of Abbington's money to Karen Mitchell, when in fact not one dime was ever transferred to Karen. Rather, all of such monies were used to pay Abbington's expenses. All of such attorneys knew that such

allegation was and is false and yet have proceeded to file such lawsuit or have participated in the filing of such lawsuit.

PLAINTIFFS

2. Plaintiff Karen Mitchell ("Karen") is a resident of North Carolina.

3. Plaintiff James Mitchell ("James") is a resident of North Carolina. James is the majority equity holder and manager of Abbington.

DEFENDANTS

4. Defendant Reimber & Braunstein LLP ("R&B") is a law firm.

5. Defendant Mark W. Corner ("Corner") is an attorney barred in Massachusetts and is a partner of R&B. Corner represents Desmond.

6. Defendant Alan L. Braunstein ("Braunstein") is an attorney barred in Massachusetts and is a partner of R&B. Braunstein also represents Desmond.

7. Defendant John O. Desmond ("Desmond") is an attorney barred in Massachusetts.

8. Defendant Frank Iacono ("Iacono") is an attorney barred in New York.

9. Defendant Iacono Law, LLC ("Iacono Law") is a limited liability company controlled by Iacono.

10. Defendant South Haven Financial, LLC ("South Haven") is a limited liability company controlled by Iacono.

11. Defendant Bimal Raj Merchant ("Merchant") is an attorney barred in Arizona.

12. Defendant John W. Powers ("Powers") is an attorney barred in Arizona.

NON-PARTIES

13. Abbington Partners, LLC ("Abbington") is a limited liability partnership located at Six Consultant Place, Suite 100A, Durham North Carolinia.

STATEMENT OF FACTS

## 1  Abbington Partners, LLC

14.  James (who is not a lawyer) is an entrepreneur who is interested in the intersection of business and law.

15.  In April 2011, he attended a legal conference at which he learned about a new case type, namely issuers ("ARS Issuer Clients") of auction rate securities ("ARS") bringing FINRA arbitration claims against the broker/dealers who underwrote the issuance of ARS bonds.

16.  James decided to establish a business that would solicit ARS Issuer Clients.

17.  James referred the cases he signed up through an Arizona law firm he established, Powers & Merchant PLLC.

18.  Such cases were referred by James to two law firms that specialize in FINRA arbitration claims: Fishman Haygood and Dimond Kaplan.

19.  James set up an office at 76 Summer Street in Boston and hired as independent contractors approximately eight people, two of whom – Ralph Griesenbeck ("Griesenbeck") and John DerBoghosian ("DerBoghosian") – were software developers and/or system administrators.

20.  Abbington raised money from Frank Iacono ("Iacono"), who liked James' idea so much that he repeatedly tried to buy James out.

21.  After several refusals by James, Iacono decided to simply steal James' business, and such theft was effectuated in August 2012, when Iacono persuaded several key Abbington workers to quit working for Abbington and work for Iacono (the "Departure").[1]

## 2  Monies Loaned by Karen

22.  At various points in time, Karen has loaded Abbington monies, with the expectation that she will be paid back.

---

1.  "When I was young, I prayed that the Good Lord would bring me a bicycle. After years of praying, I gave up and stola a bicycle and prayed that the Good Lord would forgive me."

23. As of June 2013, the monies (including principal and interest) owed by Abbington to Karen exceeded $51,000.

## 3  The Suffolk Action

24. After Iacono orchestrated the theft of Abbington's business, Abbington retained attorneys Robert Cohan and Jonathan Plaut (together, "Cohan/Plaut").

25. Mitchell also retained Cohan/Plaut to represent Mitchell individually.

26. Mitchell had interests that were separate from Abbington, such as the fact that Iacono asserted claims against Mitchell individually in the JAMS Arbitration.

27. Cohan/Plaut filed suit against Iacono and other in Sulfolk Superior Court, Boston, Massachusetts (the "Suffolk Action").

## 4  The DerBoghosian Attachment

28. In Spring 2013, the first ARS case settled, netting approximately $672,000 in legal fees.

29. The Suffolk Court ordered that $300,000 of such monies be distributed to Abbington, as follows: $200,000 to Abbington and $100,000 to be set aside for arbitration fees in New York.

30. Of the $200,000 for Abbington, Abbington's counsel received $100,000, with Abbington expecting to receive the remaining $100,000.

31. However, literally the day Abbington received its check, Iacono through DerBoghosian filed a motion to attach Abbington's monies.

32. The Suffolk Court ordered Abbington to escrow $49,000 in favor of a wage claim by John DerBoghosian.

33. Accordingly, due to Iacono's tactics, Abbington ended up with only $51,000.

34. Due to various stalling tactics by Iacono, Abbington received such monies in June 2013.

35. As of June 2013, with principal and interest, Abbington owed Karen more than $51,000.

## 5  Protecting the $51,000 [2]

36. Due to Iacono's scorched earth litigation tactics, Mitchell was understandably concerned that Iacono would seek to somehow attach the remaining $51,000.

37. Accordingly, Mitchell took appropriate steps to protect Abbington's business operations.

38. As Manager of Abbington, Mitchell had a fiduciary duty to Abbington's equity holders to try to protect Abbington from further harm from Iacono.

39. Essentially all or all of the $51,000 was transferred to another company, Essex LLP and/or converted to cash.

40. Of the money transferred to Essex, all of such monies were then used either for paying Abbington's operating expenses or were transferred back to Abbington in small amounts.

41. By "small amounts," James means the following: Essex would write a check for, say, $2000 to Abbington so that Abbington could pay some bills.

42. That way, should Iacono obtain a second attachment over Abbington's account, only $2000 would be attached, rather than $51,000.

43. Of the cash withdrawl, all of such cash was either deposited back into Abbington's bank account (again, in small amounts) or used to pay Abbington's expenses.

44. All of the $51,000 was used for Abbington's operating costs, including office supplies, telephone, and payments to two Abbington full-time workers.

45. None of the $51,000 was paid (directly or indirectly) to Karen and any affiliate of Karen.

46. The structure set up by Mitchell was successful, as Iacono was not able to attach any of the $51,000.

---

2.  James does not remember the exact details of the transfers described in this Section 5. He reserves the right to amend this section once he obtains copies of the relevant bank statements (which were obtained during the JAMS Arbitration but James no longer has copies of all of such statements). James is 100 percent certain that all of the $51,000 was spent on Abbington's operating expenses and that none of such monies was ever paid to Karen.

47. Accordingly, Abbington's other creditors benefitted tremendously by James' actions.

## 6  Knowledge by Iacono and Others

48. During the JAMS Arbitration, Iacono and Merchant obtained copies of the relevant bank statements for Abbington and Essex, and thus knew that <u>none</u> of such monies were ever transferred to Karen.

49. Subsequently, after the Third Bankruptcy Case was filed, Desmond, Corner and Braunstein became aware that Karen received none of the $51,000.

50. In addition, Iacono, Merchant, Desmond, Corner and Braunstein knew that as of June 2013, Abbington owed Karen more than $51,000.

## 7  The First Bankruptcy Case

51. After the Departure, Abbington started to run out of cash, and was unable to pay rent for its main office at 76 Summer Street, owned by Kalnex, as well as a second office.

52. Kalnex and the other landlord initiated eviction proceedings against Abbington.

53. In January 2013, Abbington filed a voluntary bankruptcy petition in Boston, case 13-10224 (Feeney, J) (the "First Bankruptcy Case"), which stopped the two eviction proceedings.

54. Both landlords sought relief from the automatic stay.

55. On February 11, 2013, a hearing was held on these two motions.

56. At such hearing, the bankruptcy court (Feeney, J.) allowed the motions of both landlords.

57. Abbington was evicted from both premises, including 76 Summer Street, in February 2013.

58. Iacono was fully aware that Abbington had been evicted from 76 Summer Street, in part because he paid Burns & Levinson to monitor the First Bankruptcy Case.

59. Thus, starting in February 2013, Iacono was aware that Abbington no longer had offices at 76 Summer Street.

## 8 The Second Bankrutpcy Case

60. In early 2014, Abbington relocated to North Carolina, establishing offices at Six Consultant Place, Durham, North Carolina.

61. At the same time, James moved to North Carolina, as did Abbington's software developer/system administrator, Ralph Griesenbeck ("Griesenbeck").

62. In June 2014, Abbington filed a voluntary Chapter 11 case in the Middle District of North Carolina, Case no. BK-14-8 (the "Second Bankruptcy Case").

63. Iacono filed certain motions in the Second Bankruptcy Case.

64. In opposition, in July 2014, James filed one affidavit from himself, two affidavits from Griesenbeck, and two affidavits from Karen conclusively demonstrating that Abbington had permanently relocated to North Carolina in early 2014 and after such move, Abbington had no connection with, or assets in, Massachusetts.

65. In such affidavits, James conclusively demonstrated that Abbington had set up offices in Durham, North Carolina, and James even attached photographs of Abbington's office space in Durham, comprising about six offices, including James' office and Griesenbeck's office.

66. Thus, as of July 2014, Iacono was aware that Abbington had relocated to North Carolina and no longer had offices at 76 Summer Street.

## 9 The Third Bankruptcy Case / Perjury by Iacono [3]

67. In May 2015, Iacono and two other purported creditors of Abbington filed an involuntary petition against Abbington in the Boston bankruptcy court (the "Third Bankruptcy Case").

68. In the Third Bankruptcy Case, Desmond was appointed Chapter 7 Trustee of the Abbington Estate. Judge Baly is the bankruptcy judge.

69. In May 2015, Abbington's address was Six Consultant Place, Durham, North Carolina.

---

3. As will be noted in other pleadings, the other individuals (Stamatia Astras and David Byer) signing the involuntary petition knew they were committing perjury when they signed the involuntary petition. They are not, however, defendants in this action and thus the plaintiffs have not gone into detail as to their crimes.

70. As of May 2015, Iacono knew that Abbington was located in North Carolina and not in Massachusetts.

71. On the involuntary petition, Iacono listed 76 Summer Street, Boston as Abbington's addess, even though Abbington had not been located at such address for approximately 15 months.

72. Iacono committed perjury because he wants to file his involuntary petition in Boston, rather than in North Carolina.

73. Even though Desmond knew and knows that Iacono committed perjury in filling out the involuntary petition, Desmond has not brought Iacono's criminal conduct to Judge Baly or the U.S. Trustee's Office.

## 10 Cooperation by Mitchell

74. On July 17, 2015, Iacono emailed Mitchell copies of this Court's order appointing attorney Desmond as the Chapter 7 Trustee.

75. Within an hour or two, Mitchell telephoned Desmond to introduce himself and to answer any questions Desmond might have. Desmond then conferenced in Braunstein.

76. In subsequent calls with Mitchell, Braunstein conferenced in attorney Corner.

77. On the first phone call with the Trustee and Bronstein, they asked James to provide them with numerous documents.

78. James proposed using Dropbox; they agreed.

79. James spent about ten hours assembling the documents and putting them into various folders and subfolders, in order to save them time.

80. After about a week, R&B informed Mitchell that they considered Dropbox to be insecure.4

---

4.  From a technical point of view, such an objection is ridiculous, as Dropbox is a major company currently valued at approximately $10 billion, and is used by most Fortune 500 companies. Even if it was true, R&B could easily install Dropbox on a PC not attached to their local area network and then have all of the files downloaded to the PC. They could then use a USB memory stick to transfer the files to their local area network.

81. They proposed their own file sharing service (the "FSS").

82. Mitchell spent several hours (including phone calls with R&B's technology personnel and technical support with the FSS), including repeated reinstallation by Mitchell of various Java libraries.

83. After all of that effort by Mitchell, the FSS simply does not work. Mitchell then left various phone calls with R&B, which were not returned.

84. Neither the Trustee nor R&B has made any effort to find a way so that Mitchell can transfer the documents he so painstakingly assembled.

85. Overall, Mitchell has left more than 20 telephone messages for Mark Corner which Corner refuses to return. The same is true for Alan Braunstein, except that the number of unreturned telephone calls is much less.

86. In various pleadings filed by Desmond in the Third Bankruptcy Case, with the assistance of Corner and Braunstein, Desmond has lied to the bankruptcy court, claiming that James has not cooperated with the Trustee.

87. Such statements are untrue.

88. The truth is that James has gone to heroic efforts to cooperate with Desmond.

## 11  October 21, 2015 341 Examination

89. In the Third Bankruptcy Case, a 341 examination was conducted, with

Mitchell testifying by telephone.

90. Such hearing lasted several hours.

91. Mitchell stayed until Desmond, Corner, and Iacono (collectively, the

"Questioners") had concluded asking all of their questions.

92. Mitchell answered all questions asked by the Questioners that related to

Abbington's finances.

93. Several times Desmond or Corner they asked questions James did not know the answers to.

94. James volunteered that he could look up the answer by accessing documents on James' computer.

95. In other words, in 60 seconds or so, James could answer the question with a definite, clear, accurate answer.

96. In *each* case, Desmond or Corner said in effect, "Never mind" -- they did not want James to look up the answer.

97. Given this happened numerous times, an objective observer would conclude that the Trustee was more interested in "scoring points" than in collecting information.

## 12  April 21, 2016 Hearing

98. In the Third Bankruptcy Case, a hearing was held in Boston.

99. James appeared telephonically.

100. At such hearing, Braunstein made several misrepresentations to the bankrutpcy court.

101. All of such misrepresentations were deliberate.

102. Braunstein stated that Mitchell had made inconsistent statements are to which creditors of Abbington were contested or disputed.

103. In fact, Mitchell has never made inconsistent statements as to this issue.

104. Braunstein claimed that that by having held a telephonic hearing, Desmond was handicapped in investigating Abbington's finances.

105. Such statement was untrue, as the April 21, 2015 was completely productive.

106. To the extent that Desmond has been handicapped, it is solely due to Desmond's, Braunstein's and Corner's total lack of interest in obtaining the voluminous documents Mitchell had assembled for them.

## 13  Motion to Compel

107. The April 21, 2016 hearing concerning in part a motion by Desmond to compel James to appear in Boston

108. The purported reason is that more information can be obtained in an in person hearing.

109. The real purpose by Desmond, Braunstein and Corner is to annoy and harass James and to make him travel 700 miles for no reason than to inconvenience him.

## 14  Offer by Iacono

110. On date(s) not known to the Plaintiffs, Iacono has made an offer to fund a reorganization of Abbington (the "Proposal Chapter 11 Reorganization").

111. Under such proposal, the Trustee would convert the Chapter 7 Abbington case to a Chapter 11 case.

112. As noted in Section 17, Desmond wants to accept Iacono's proposal because he would receive a commission for any monies he brings in from Iacono.

113. As noted in Section 17, Corner and Braunstein want Desmond to accept Iacono's proposal because they want to bill additional legal fees to the Abbington Estate.

114. Iacono has conditioned his offer on Desmond filing the First Adversary Action.

## 15  The First Adversary Action

115. As noted in Section 3, Cohan/Plaut represented James individually in the dispute with Iacono.

116. Desmond, Corner and Braunstein knew that Cohan/Plaut represented James individually.

117. In August 2015, Desmond filed an adversary action (the "First Adversary Action") against attorneys Robert Cohan and Jonathan Plaut.

118. Desmond repeatedly sought communications between Mitchell and Cohan/Plaut, even though such communications were privileged as to Mitchell.

119. Mitchell repeatedly informed Desmond that he was not willing to wave the attorney-client privilige.

120. Desmond deliberately ignored such communications from Mitchell.

121. Desmond argued that as Trustee of the Abbington Estate, he was waiving such privilige as to Abbington.

122. Such argument by Desmond was utterly frivilious because all or essentially all of the communications and documents Desmond was waiving the privilige for were also priviliged as to Mitchell, and Desmond has no legal authority to waive the privilige as to Mitchell.

123. Desmond's attempt to obtain the priviliged documents and materials were almost completely unsuccessful, as Judge Baly refused every one of Desmond's requests except to copies of the client engagement agreements executed by Abbington and Mitchell.

124. Desmond knew that his request to have access to the priviliged communications and documents was utterly frivilious.

125. In the First Adversary Action, Corner represented Desmond.

126. In drafting and prosecuting the First Adversary Action, Corner knew that Desmond's request to have access to Mitchell's priviliged communications and documents was utterly frivilious.

## 16  The Second Adversary Action

127. As a condition to Iacono funding the Proposed Chapter 11 Reorganization, Iacono required that Desmond file an adversary action against Karen and James.

128. Iacono's motives were to annoy and harass Karen and James, to cause them emotional pain and suffering, to attempt to extort money from Karen and James, and to attempt to persuade James to drop his claims against Iacono.

129. Iacono knew that Abbington had not transferred any monies to Karen.

130. Pursuant to Iacono's demands, in April 2016, Desmond filed an adversary action against Karen and James (the "Second Adversary Action").

131. In filing such action, Desmond knew that such action was utterly frivilious, if for no other reason than Karen never received any monies from Abbington.

132. In addition, such action was utterly frivilious because even if

133. Desmond knew that the filing and prosecution of such action would cause considerable harm to Karen and James.

134. In filing such action, Desmond was represented by Corner.

135. In drafting the pleadings in the Second Adversary Action and in filing such action on behalf of Desmond, Corner knew the Second Adversary Action was utterly frivilious.

136. Corner knew that the filing and prosecution of such action would cause considerable harm to Karen and James.

137. Although Braunsein is not listed as counsel for Desmond, he does represent Desmond, he is a law partner of Corner, and Braunstein actively participated in the drafting and prosecution of the Second Adversary Action.

138. Braunstein knew the Second Adversary Action was utterly frivilious.

139. Braunstein knew that the filing and prosecution of such action would cause considerable harm to Karen and James.

140. Iacono, Merchant, Desmond, Corner and Braunstein knew that the Second Adversary Action was frivilious because Abbington has never paid Karen any monies, and even if it had (which it did not), Karen was owed by Abbington more than $51,000.

## 17 Motives

141. Iacono's motives in causing the Second Adversary Action to be filed were to cause James and Karen emotional paint and suffering and to attempt to coerce James from dropping his claims against Iacono.

142. Merchant's motives in causing the Second Adversary Action to be filed were to cause James and Karen emotional paint and suffering and to attempt to coerce James from dropping his claims against Merchant.

143. Iacono Law's motives in causing the Second Adversary Action to be filed were to attempt to coerce James from dropping his claims against Iacono.

144. Desmond's motives in causing the Second Adversary Action to be filed were to obtain the Iacono Monies for a Chapter 11 in order to obtain higher Chapter 7 Trustee commissions and to extort money from James and Karen.

145. Braunstein's and Corner's motives in causing the Second Adversary to be filed were to increase the legal fees incurred by the Trustee, knowing that legal fees are administrative expenses which are paid before other claims against the Abbington estate.

<u>COUNT ONE</u>

Abuse of Process

146. Plaintiffs repeat and reallege the allegations set forth above.

147. In filing the Second Adversary Action ("SAA"), Iacono, Merchant, Desmond, Corner and Braunstein (collectively, the "Desmond Group") acted with malice towards Karen and James.

148. Each of them knew and knows that Abbington has not paid any monies to Karen.

149. Each of them knew and knows that even if Abbington had paid monies to Karen, Abbington owed Karen more than $51,000.

150. The filing of the SAA, and its prosecution by Desmond with the assistance of the other members of the Desmond Group, were made for several improper and illegitimate purposes.

151. The filing and prosecution of the CFCC, and its prosecution by Desmond with the other members of the Desmond Group, was used to accomplish some ulterior purpose (as noted herein) for which the process is not designed or intended. It was not the legitimate purpose of the process employed.

152. Such improper and illegitimate purposes include without limitation:

(i) for their general hatred for Karen and JamesMitchell and Abbington, and in their desire to cause Mitchell loss of sleep, nervousness, and inability to concentrate. They take enormous pleasure in tormenting Mitchell, what in German is called *schadenfreude.*

(ii) in their attempt to cause Mitchell and Abbington to relinquish pursuing their claims against each member of the Caven/Iacono Group through the filing of a *First Amended Complaint*, and in an appeal with the Massachusetts Appeals Court, and in other forums;

(iii) in their attempt to cause Mitchell and Abbington to not file bar complaints against Iacono, Merchant and/or Powers;

(iv) in their attempt to cause Abbington to not initate an arbitration proceeding against Merchant and/or Powers with the American Arbitration Association ("AAA");

(v) in their attempt to cause Abbington and Mitchell to spend time and energy defending themselves in a completely meritless Rule 65.3 action;

(vi) in their desire to steal any new business ideas Mitchell has that are similar to an ARS origination business, since as demonstrated above, none of them has the ability to generate such ideas; and

(vii) in their desire to steal any possible lenders and/or investors that Mitchell might know who would finance a business similar to an ARS origination business.

153. The sole motivation of each member of the Caven/Iacono Group was to accomplish the improper goals listed in p. 152, rather than to ascertain the current financial situation of Abbington and Mitchell.

154.    As a result of the actions of each member of the Desmond Group, the following has happened:

(i)  Karen and James have not been able to sleep, they are extremely nervous about the filing of the SAA against them, now sufferes from severe anxiety, and has not been able to concentrate.[5]

(ii)  for several days, James has not been able to perform any work, he has slept extremely erratically, he had had a enormous drop in appetite, and he has been unable to concentrate

(iii)  As a result of the filing of the Complaint, Mitchell has suffered a loss of reputation, personal humiliation, and mental anguish and suffering. On account of the duplicitous actions of the Caven/Iacono Group, Mitchell no longer enjoys advantageous business relations with several prominent executives, attorneys, and other titans of industry. This makes it significantly more challenging to pursue other business ventures.

(iv)  Karen and James have incurred legal fees and other expenses. [6]

155.    All of the foregoing occurred entirely as result of the CFCC being filed and served upon Mitchell. All of the foregoing was known as likely to happen by each member of the Caven/Iacono Group.

---

5.   Physical manifestation of emotional distress is not necessary to assert damages in an abuse of process action. As noted in *Millenium Equity Holdings , LLC v. Mahlowitz*, 456 Mass. 627, 648 (2010):

> A claim for abuse of process is distinguishable from an action for intentional or negligent infliction of emotional distress, where physical manifestation of emotional distress is generally required as an element of the tort. See American Velodur Metal, Inc. v. Schinabeck, 20 Mass. App. Ct. 460 , 470 (1985); Restatement (Second) of Torts, § 905 comment c (1979). [Note 30] We have not required a showing of physical harm for damages resulting from abuse of process, and we decline to do so here. See, e.g., American Velodur Metal, Inc. v. Schinabeck, supra (parties may recover for mental suffering, distress, and harassment if caused by abuse of process); Titcomb v. Bay State Grocery Co., 254 Mass. 599 , 601 (1926), citing Malone v. Belcher, 216 Mass. 209 (1913) (damages may be awarded for injury to "feelings" in abuse of process claim).

6.   The "natural and probable" consequences of an abuse of process lawsuit include the costs incurred in successfully defending the charge. As such, fees for defending such a lawsuit are considered compensatory damages, not attorney's fees. See <u>American Velodur Metal, Inc. v. Schinabeck</u>, 20 Mass. App. Ct. 460 , 470 (1985)

156.    Desmond's filing of the SAA, and the other members of the Desmond Group's active participation and cooperation with Desmond, was a willful and malicious act in the use of judicial process for an ulterior purpose not proper in the regular course of the proceeding.

Wherefore, Plaintiffs pray for judgment against all Defendants, and each of them, as more fully set forth below.

## COUNT TWO

### Civil Conspiracy

### Note – To be Added

157.  Plaintiffs repeat and reallege the allegations set forth above.

158.

Wherefore, Plaintiffs pray for judgment against all Defendants, and each of them, as more fully set forth below.

## COUNT THREE

### RICO

159.  Plaintiffs repeat and reallege the allegations set forth above.

160.  This Count arises under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961-1968.  The jurisdiction of this Court is invoked pursuant to 18 U.S.C. § 1964 (c) and the principle that state courts have concurrent subject matter jurisdiction with federal courts over cases arising under federal laws.

161.  Whenever reference is made to any act, deed or transaction of any professional corporation, such allegations shall be deemed to mean that said corporation engaged in such act, deed or transaction by or through its officers, directors, members, partners, associates, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of its business or affairs.

162.  Iacono, Merchant, Desmond, Corner, Braunstein, and R&B are, and at all relevant times have been, a "person" within the meaning of 18 U.S.C. §§ 1961 (3) and 1964 (c).

163. Various persons, not made defendants herein, participated as co-conspirators in the predicate acts of racketeering activity herein and performed acts and made statement in furtherance thereof.

164. Various persons, including each member of the Desmond Group were associated in fact with each other and thereby constituted an "enterprise," as defined in 18 U.S.C. § 1961 (4), individually, collectively and in any combination among them.

165. One of the purposes of the aforesaid enterprise was to extort Karen and James of money and property.

166. During the period covered by this count, the enterprise was engaged in, and its activities affected, interstate commerce.

167. At all times material herein, the federal mail fraud statute, 18 U.S.C. § 1341, violation of which constitutes a felony, provided, in pertinent part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be ... [guilty of an offense].

168. At all times material herein, violations of the wire fraud statute and the mail fraud statute constituted acts of "racketeering activity" as defined in 18 U.S.C. § 1961 (1).

169. The pattern of racketeering activity which is the subject of this count consisted of multiple predicate acts involving mail fraud and wire fraud. The specific acts of racketeering activity committed by each member of the Desmond Group are set forth below.

170. Beginning in 2015 and continuing up to the present, each member of the Desmond Group knowingly and willfully devised and intended to devise a scheme and artifice to extort money from Karen and James.

171. Each of the criminal acts commited by each member of the Desmond Group are separate and distinct indictable acts from the other criminal acts. Each of such

criminal acts are related to each other in that they constitute separate acts by each member of the Desmond Group and each member of the Desmond Group to commit wire and mail fraud and to extort money from Karen and James.

172. Such criminal acts are ongoing and pose a threat of continued criminal activity on the part of each member of the Desmond Group.

173. On information and belief, each member of the Desmond for the purpose of executing and carrying out the aforesaid scheme and artifice to defraud, and attempting to do so, did knowingly cause: numerous written materials to be placed in the mail for delivery by the United States Postal Service, according to the directions thereon, between or among each member of the Desmond Group in violation of the federal mail fraud statute, 18 U.S.C. § 1341.

174. These repeated acts of mail fraud and wire fraud occurred after the effective date of RICO [October 15, 1970] and within ten years of each other, and in part within the past four years, and constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961 (5).

175. Each member of the Desmond Group has not limited themselves to a single criminal episode with a single victim but have engaged in a pattern and practice of fraudulent schemes and acts against Karen and James.

176. At all times material herein, each member of the Desmond Group, being a person associated with the enterprise described in this count, unlawfully and willfully conducted and participated, directly or indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as set forth above, in violation of 18 U.S.C. § 1962 (c).

177. Each member of the Desmond Group and other members of the enterprise formed a conspiracy to violate 18 U.S.C. § 1962 (a) (i.e., a conspiracy to receive income derived directly or indirectly from the aforesaid pattern of racketeering activity, to use and invest, directly or indirectly, part of such income, or proceeds in operation of the racketeering enterprise described above), in violation of 18 U.S.C. § 1962 (d).

178. Each member of the Desmond Group and other members of the enterprise also formed a conspiracy to violate 18 U.S.C. § 1962 (c) (i.e., a conspiracy to conduct and participate, directly or indirectly, in the conduct of the affairs of the racketeering enterprise through a pattern of racketeering activity, as set forth above), in violation of 18 U.S.C. § 1962 (d).

179. Karen and James have been injured in their business or property by reason of each member of the Desmond Group's aforesaid violations of 18 U.S.C. §§ 1962 (a), 1962 (c) and 1962 (d).

Wherefore, Plaintiffs pray for judgment against all Defendants, and each of them, as more fully set forth below.

COUNT FOUR

Punitive Damages

180. Plaintiffs repeat and reallege the allegations set forth above.

181. Ordinarily Massachusetts does not permit the awarding of punitive damages. Other states do, however, including New York, Arizona and North Carolina.

182. Iacono lives in New York state and most of his tortious conduct toward Karen and James (as specified herein) has occurred in New York State. The same is true of Iacono Law.

183. Merchant lives in Arizona and most of his tortious conduct toward Karen and James (as specified herein) has occurred in Arizona.

184. Desmond, Corner and Braunstein reside and work in Massachusetts.

185. In commiting the outrageous acts described herein, they caused injury to occur in North Carolina, and they should be subject to the punitive damage laws of North Carolina.

186. The conduct of each member of the Desmond Group (each of whom are working with each other) is outrageous and illegal.

187. Such conduct clearly "shocks the conscience" such that the award of punitive damages is warranted against each of them.

188. Such an award would punish them for the improper conduct and would deter them from engaging in such conduct in the future.

Wherefore, Plaintiffs prays for judgment against all Defendants, and each of them, as follows:

1. For general damages as may be established at trial.

2. For special damages as may be established at trial.

    3. For punitive damages as may be established at trial.

    4. For costs of suit incurred herein, including, but not limited to, attorney's fees.

    5. For interest on the above amounts from the date of this Complaint at the statutory rate of interest.

    6. For such other and further relief as this Court may deem just and proper.

Dated: May __, 2016.

_____

Karen Mitchell
Six Consultant Place, Suite 100A
Durham, North Carolina 27707
(919) 225-4178
Fax (424) 249-7990
karenleejmitchell@gmail.com


_____

James Mitchell
Six Consultant Place, Suite 100A
Durham, North Carolina 27707
(424) 249-7910
Fax (424) 249-7990
jmitchell@abbingtonpartners.com

## DEMAND FOR JURY TRIAL

Plaintiffs Karen Mitchell and James Mitchell demand a trial by jury on all counts of their complaint.

_____
Karen Mitchell

_____
James Mitchell

## VERIFICATION

I declare under the pains and penalties of perjury under the laws of the State of North Carolina that I have read the foregoing Verified Complaint. Based on my own personal knowledge, the facts (except those matters which are stated on information and belief) alleged under the section "Statement of Facts" are true and accurate to the best of my knowledge. As to those facts alleged under the section "Statement of Facts" which are stated on information and belief, I believe them to be true.

Date: May __, 2016.

_____
Karen Mitchell

_____
James Mitchell